IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| ROBIN W. McDANIEL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 04-0658-CV-W-DW |
| | ) | |
| ADT SECURITY SERVICES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

# ORDER

Robin W. McDaniel sues her former employer, ADT Security Services, Inc., alleging illegal race discrimination. See 42 U.S.C. §§ 2000e - 2000e-17; 42 U.S.C. § 1981; Mo. Rev. Stat. § 213.055. Before the Court is ADT's motion for summary judgment (Doc. 39). The motion is granted.

**I.    Summary Judgment Standard**

"Summary judgment is appropriate only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." Rodgers v. U.S. Bank, N.A., 417 F.3d 845, 850 (8th Cir. 2005); Fed. R. Civ. P. 56. "The burden of demonstrating that there are no genuine issues of material fact rests on the moving party." Winthrop Res. Corp. v. Eaton Hydraulics, Inc., 361 F.3d 465, 468 (8th Cir. 2004). However, the non-moving party must present evidence sufficiently supporting the disputed material facts that a reasonable jury could return a verdict in her favor. Rodgers, 417 F.3d at 850. The facts and inferences from those facts are viewed in the light most favorable to the nonmoving party. See Horn v. Univ. of Minn., 362 F.3d 1042, 1045 (8th Cir. 2004). "While summary judgment should seldom be utilized in

employment discrimination cases, there is no 'discrimination case exception' to the application of Fed. R. Civ. P. 56, and it remains a useful pretrial tool to determine whether or not any case, including one alleging discrimination, merits a trial." Rodgers, 417 F.3d at 850 (citations and internal quotations omitted).

## II. Factual Background

McDaniel, who is black, worked at ADT's Kansas City call center from 1996 until 2003. She was employed as an inbound customer service representative, with duties including responding to commercial and residential customers on matters relating to their alarm systems. She reported directly to Vivian Jordan, who is black. Main supervisors at the call center included customer care director David Knack and human resources manager Jane Wenk, both of whom are non-black. McDaniel liked her job, and her supervisors generally liked her performance as a call center employee.

While employed by ADT, she dated and eventually became engaged to Cornell Beck, the call center's quality assurance manager. In January 2003, McDaniel and Beck notified the human resources department that they had become engaged. Until then, no one in human resources knew that McDaniel and Beck were dating. Shortly after announcing the engagement, on January 6, Knack and Wenk met with McDaniel and Beck. The supervisors said there was a problem with McDaniel's engagement to Beck because it would potentially violate ADT's conflict-of-interest policy. At the meeting, Wenk told McDaniel that she would need to find a position at ADT that was not subject to evaluation by the quality assurance department.

After being confronted about their relationship, McDaniel and Beck complained, identifying other employees they thought violated the policy. McDaniel accused ADT of

2

discriminating against her because of her race.[1]  Beck objected similarly.  After receiving the complaints of unfair application of the policy, ADT enforced it against several other employees, requiring them to transfer or be terminated.

On January 21, Wenk informed McDaniel that she had 60 days to find another position at ADT.  At Knack's direction, Wenk agreed to help McDaniel find a new position.  From February 3, 2003 to April 3, 2003, ADT moved McDaniel temporarily to a receptionist position.  The company changed the job hours of that position to accommodate her schedule.  Wenk later told McDaniel that a second shift floor coordinator position was available and posted, but McDaniel said she was not interested because of conflicts with her schedule.  On April 10, 2003, ADT terminated McDaniel's employment.

In August 2003, on its own initiative, ADT re-hired McDaniel as an outbound customer service representative, to begin work in September.  She resigned from that position in October 2003 to take a position with another organization.

## III. Discussion

### A. McDaniel's theory of race discrimination

McDaniel's theory of disparate treatment is as follows:  ADT knew of non-black employees violating the conflict-of-interest policy, but did nothing to address the conflicts.  When ADT learned of McDaniel's engagement, it enforced the policy against her.  Then Beck and McDaniel complained that other employees had prohibited relationships, and that they were

---

[1] Based on directly contradictory statements within McDaniel's deposition, and the other record evidence, the Court questions whether a reasonable jury would believe that she complained of race discrimination to anyone at ADT.  Nonetheless, on summary judgment, the Court will accept as true her late-deposition revision.

3

being discriminated against based on race. In response, ADT enforced the policy against other employees. McDaniel contends that ADT was "caught with its hand in the cookie jar," that its enforcement of the policy against non-black couples was a "knee-jerk response" to negate McDaniel's potential claims of race discrimination.

### B. Burden-shifting framework

Because McDaniel relies on circumstantial evidence of discrimination, her Title VII, section 1981, and MHRA claims are assessed using the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). See Johnson v. AT&T Corp., 422 F.3d 756, 761 (8th Cir. 2005). A plaintiff bears the initial burden of establishing a prima facie case sufficient to create an inference of discrimination. See Davis v. KARK-TV, Inc., 421 F.3d 699, 704 (8th Cir. 2005). Once a prima facie case is established, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its adverse employment action. See id. "If the employer meets its burden, the presumption of discrimination disappears, requiring the plaintiff to prove that the proffered justification is merely a pretext for discrimination." Id. (internal quotation omitted). "The plaintiff has the burden of persuasion at all times." Id.

### C. Prima facie case of disparate treatment

To make a prima facie case, McDaniel must prove that (1) she is a member of a protected class, (2) she met the legitimate expectations of her employer, (3) she suffered an adverse employment action, and (4) similarly-situated employees who were not members of the protected class were treated differently. See Philip v. Ford Motor Co., 413 F.3d 766, 768 (8th Cir. 2005). It is undisputed that McDaniel is a member of a protected group who suffered an adverse

4

employment action.  McDaniel also adequately shows that she met ADT's legitimate expectations.  The evidence is that she was generally a good employee.  ADT argues that McDaniel was not meeting its expectations because she violated the policy on conflicts.  True, the McDaniel-Beck relation offended the letter of ADT's written policy.  But McDaniel's claim is essentially that—because ADT allowed other employees to break the rules with impunity—the company could not *legitimately* expect anything different from her.  This whole case is about defining ADT's legitimate expectations as to the policy.

The fighting issue is whether McDaniel has produced sufficient evidence that she was treated less favorably than similarly situated non-black employees.  See Rodgers, 417 F.3d at 852 ("low-threshold standard" for prima facie case).  The Court doubts she has, but for the sake of argument, it assumes that McDaniel has made a prima facie case of discrimination.

### D. ADT's legitimate nondiscriminatory reason

ADT has the burden of production to show that it had a legitimate, nondiscriminatory reason for its adverse employment action against McDaniel.  ADT's proffered reason is that its conflict-of-interest policy did not allow the relationship between McDaniel and Beck.  "The burden to articulate a nondiscriminatory justification is not onerous, and the explanation need not be demonstrated by a preponderance of the evidence."  Floyd v. Mo. Dept. of Soc. Servs., Div. of Family Servs., 188 F.3d 932, 936 (8th Cir. 1999).  Accordingly, the ultimate burden falls on McDaniel to produce evidence sufficient to create a genuine issue of material fact that ADT's proffered nondiscriminatory reason is a pretext for discrimination.  See Rodgers, 417 F.3d at 853; Groves v. Cost Planning and Mgmt. Intern., Inc., 372 F.3d 1008, 1010 (8th Cir. 2004) (plaintiff must show by a preponderance of evidence that employer's proffered explanation "is

5

unworthy of credence").

**E.     Pretext**

McDaniel attempts to prove pretext with evidence of the following: (1) disparate treatment of her and similarly situated non-black employees; and (2) ADT's enforcement of the conflict-of-interest policy against her first, and against non-black employees only after she complained.

**1.     Evidence of disparate treatment**

**a.     Relevant comparisons**

At the pretext stage of the McDonnell Douglas analysis, "the test for determining whether employees are similarly situated to a plaintiff is a rigorous one." Rodgers, 417 F.3d at 853. McDaniel must show that "she and the employees outside of her protected group were similarly situated in all relevant respects." Id. Unsubstantiated allegations of disparate treatment are insufficient to survive summary judgment. Clearwater v. Indep. Sch. Dist. No. 166, 231 F.3d 1122, 1127 (8th Cir. 2000).

McDaniel attempts to prove disparate treatment by demonstrating that she was treated less favorably than similarly situated employees outside of her protected group. Specifically, she argues that she was terminated for violating the same conflict-of-interest policy as non-black employees who were not disciplined for violating the policy. It is undisputed that all employees were eventually treated equally, *after* McDaniel and Beck complained about other employee-couples. Under McDaniel's theory, the relevant time is in January 2003, when McDaniel was first told that her relationship violated ADT's policy.

In comparing other relationships to that of McDaniel and Beck, one relevant respect is

that ADT, through its managers at the call center, knew of the relationship. ADT could not apply its conflict rules to unknown relationships. In McDaniel's case, ADT learned of the engagement through a formal announcement to call center managers.

If ADT knew of a relationship, another relevant respect for comparison is that the relationship violated the letter of policy, which states, in part:

> As a result of the potential for claims of favoritism, we prohibit relatives from working in positions where one relative has direct or indirect control or influence over the other. Moreover, when Team Members who work together or supervise each other enter into a personal, non-work related relationship, one Team Member may be required to transfer or resign. In other cases where a conflict or the potential for conflict arises, even if there is no supervisory relationship involved, one person may be required to transfer or resign. . . .
>
> Other personal relationships may also raise workplace issues. While it is not our intent to unreasonably delve into your personal life, many problems can arise when our Team Members who are involved in personal relationships (including but not limited to dating relationships) work with one another. Accordingly, Team members involved in personal relationships are prohibited from directly reporting or otherwise being a subordinate in the chain of command of one another, or otherwise participating in or influencing employment decisions involving one another.

All of the asserted comparator relationships here might be regulated by parts of the policy. The Court recognizes that it is the company's prerogative to exercise business judgment in interpreting the policy. See Brant v. Shop 'n Save Warehouse Foods, Inc., 108 F.3d 935, 938-39 (8th Cir. 1997) ("The employment-discrimination laws have not vested in the federal courts the authority to sit as super-personnel departments reviewing the wisdom or fairness of the business judgments made by employers, except to the extent that those judgments involve intentional discrimination.") (quoting Hutson v. McDonnell Douglas Corp., 63 F.3d 771, 781 (8th Cir. 1995). For example, ADT is uniquely qualified to determine whether a "potential for conflict arises" and whether an employee "may be required to transfer or resign." In light of the fact that

7

ADT later used the policy to discipline all of the comparator couples, the Court will assume that each relationship violated some part of the policy.

If ADT knew of a relationship that violated the written policy, the ultimate inquiry is whether the comparator conflicts were sufficiently similar in kind and degree to the McDaniel-Beck conflict to prove pretext. It is not enough that the company knew of other relationships that violated or may have violated the policy. Comparators must have been similarly situated in all relevant respects such that ADT's exercise of business judgment in applying the policy cannot explain the disparate treatment. See Rodgers, 417 F.3d at 853.

The undisputed evidence of the McDaniel-Beck conflict is as follows: As quality assurance manager, Beck was part of the call center's senior leadership team. He had ultimate authority concerning quality assurance matters at the call center. His job duties included responsibility over monitoring calls to ensure that the representatives were following ADT's call response guidelines. Beck's department monitored McDaniel's calls, like those of other customer representatives. Quality assurance coordinators, who reported to Beck, evaluated and graded the monitored calls. Call center supervisors used those grades, and other things, to assess a representative's performance. The grades were considered in determining eligibility for certain bonuses. Employees with continually poor quality assurance evaluations could suffer discipline up to and including termination. Employees who disagreed with their scores could appeal them to the quality assurance department. McDaniel, on at least one occasion, filed an objection to a quality assurance call evaluation through her supervisor, which ultimately went to Beck for determination. In sum, McDaniel's engagement to Beck was "prohibited" because Beck participated in or influenced employment decisions involving McDaniel. The Court concludes

8

that, to be similarly situated in this relevant respect, comparator employees must have, at least, fallen under the same "prohibition" from "directly reporting or otherwise being a subordinate in the chain of command of one another, or otherwise participating in or influencing employment decisions involving one another."

### b. Comparator employees outside protected group

As discussed below, comparison to other employees cannot prove pretext in this case because no other employee was similarly situated in all relevant respects. See Rodgers, 417 F.3d at 853.

#### i. Horan and Horan

Christina Horan and Walter Horan were married employees at the call center. Walter was team manager of the resource desk, while Christina was a customer service representative in special operations. She did not report to Walter, directly or indirectly. The resource desk is responsible for entering all time exceptions in the computer. The exceptions are typically generated by the team managers. The information entered includes, for example, when an employee will be off the telephone for meetings, when she is late for a shift, vacation time, and overtime. The resource desk does not evaluate representatives' performance, but simply enters data into the computer. Beck's department, on the other hand, created grades that could influence the employment status and compensation of his future spouse. And those grades could be appealed to Beck himself. Such a level of influence, discretion, and judgment did not exist in Horan's department. The "superiors" at work, Beck and Walter Horan, performed completely different functions in different departments. See EEOC v. Kohler Co., 335 F.3d 766, 776 (8th Cir. 2003) ("[I]ndividuals used for comparison must have dealt with the same supervisor, have

9

been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances."). Therefore, the Court concludes that the Horan relationship is not sufficiently like McDaniel's to prove pretext.

### ii. Toman and Chand

Kim Toman, inbound manager for second shift, dated unit manager Dinesh Chand. Their relationship was "prohibited" because Toman reported directly to Chand. However, there is no evidence that Knack, Wenk, or anyone else in human resources knew of the relationship between Chand and Toman. McDaniel and Beck's speculation that management "must have known" is not evidence that ADT did know. On the other hand, there is some evidence that employee-couples could keep relationships private. Beck knew that Toman and Chand were involved, so Chand told him to keep it to himself so it would not cause problems at the call center. McDaniel and Beck kept their own relationship secret from supervisor's until they announced the engagement. Based on the undisputed facts, one cannot reasonably infer that call center management knew of the relationship until approximately December 2002, shortly before McDaniel was disciplined. Then, McDaniel believes, Toman was transferred to a position that did not report to Chand as a result of an investigation into a rumor regarding Chand. The Court must conclude that Toman and Chand are not similarly situated in all relevant respects to McDaniel.

### iii. Banks and Williams

Moriah Banks, an inbound customer representative, and Charles Williams, an inbound team manager, had a relationship alleged by McDaniel to violate the conflict-of-interest policy. Banks did not report to Williams because she was on a different team. Unlike in McDaniel's

10

situation, there is no evidence that Williams was in a position to influence Banks's evaluation or compensation. See Rodgers, 417 F.3d at 853 (plaintiff's burden to prove pretext). Therefore, Banks and Williams are not similarly situated in all relevant respects to McDaniel.

### iv. Heche and Dozier

Jordyn Heche and Meria Dozier had a relationship alleged by McDaniel to violate the conflict-of-interest policy. Heche and Dozier were peer employees who reported to the same supervisor, Wenk. Unlike with McDaniel and Beck, there is no evidence that either Heche or Dozier was in a position to participate in or influence employment decisions involving the other. They clearly are not similarly situated in all relevant respects to McDaniel.

### 2. Other evidence of pretext

Beyond comparison to non-black employees, McDaniel argues that the timing of the events leading to her termination creates a jury question as to whether ADT's supposed enforcement of its conflict-of-interest policy is a pretext for race discrimination. The Court disagrees.

First, McDaniel cannot make a case of disparate treatment "simply because an employee is the first to be disciplined under existing policy." Asarco, Inc. v. NLRB, 86 F.3d 1401, 1410 (5th Cir. 1996) (citing Central Freight Lines, Inc. v. NLRB, 653 F.2d 1023, 1026 (5th Cir. 1981)). Enforcement of a policy often begins with a single employee, and every employee belongs to protected groups. Business judgment in applying a policy—without evidence that the exercise of judgment is insincere—is not regulated by the civil rights laws, and cannot prove pretext. See Brant, 108 F.3d at 938-39.

Second, the timing of events after McDaniel complained of unfair or illegal treatment

11

cannot prove intentional discrimination. It is undisputed that, at some point, ADT enforced the policy against other employees. The company asserts it took these actions to eliminate conflicts, potential conflicts, or the appearance of conflicts. McDaniel says enforcement of the policy against non-black couples was a "knee-jerk response" to head off potential claims of race discrimination. The Court agrees that the evidence would support an inference that ADT became concerned about a lawsuit *after* McDaniel complained. But the evidence simply does not allow the inference that ADT was "caught with its hand in the cookie jar," that the given reason for the discipline was not true. This is *not* a retaliation case. The alleged illegal employment action took place before McDaniel (or Beck) ever complained about other couples, prompting the "knee-jerk response." The parties and the Court find no caselaw to support finding pretext under such circumstances.

Third, there is no other evidence tending to show that race was a motivating factor. McDaniel (and Beck) dispute ADT's stated reasons for the discipline, but only with their speculation and conjecture about the company's motives. See Clearwater, 231 F.3d at 1127 ("Unsubstantiated allegations are insufficient to withstand summary judgment."); Johnson v. Nordstrom, Inc., 260 F.3d 727, 733 (7th Cir. 2001) (observing that a plaintiff's subjective belief that she is being discriminated against "does not, without more, demonstrate pretext"). All of ADT's actions with respect to McDaniel are consistent with its proffered explanation. McDaniel was transferred to a temporary position (with the same pay) for more than two months. Knack and Wenk say it was to allow her time to secure another position at the call center. McDaniel was notified of available positions. She did not interview for any position, showed no interest in obtaining another position, then was terminated.

12

ADT sought to re-hire McDaniel in August, 2003, when Beck was no longer the quality assurance manager. McDaniel speculates that this invitation was part of the scheme to cover up discrimination against her. But subjective belief that her employer discriminated cannot prove that it did. See Johnson, 260 F.3d at 733. Strikingly, McDaniel *accepted* the offer to return. Then, about a month later she resigned, writing, "With deep regret and with some excitement, I must resign as outbound team member . . . . I have been presented with an educational and employment opportunity that can not be overlooked. The encouragement of ADT during the past seven years has allowed me to grow in my responsibilities and capabilities. Thank you for these successful years."

## IV.  Conclusion

Based on the admissible evidence, no reasonable jury could find that race was a motivating factor in ADT's decision to transfer and eventually terminate Robin McDaniel. Therefore, ADT's motion for summary judgment (Doc. 39) must be GRANTED.

SO ORDERED.

      /s/ Dean Whipple
Dean Whipple
United States District Judge

Date: February 28, 2006